Filed 8/16/24  In re T.G. CA1/5

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION FIVE

|  |  |
|---|---|
| In re T.G., a Person Coming Under the Juvenile Court Law. | |
| MARIN COUNTY HEALTH AND HUMAN SERVICES,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>L.G.,<br><br>        Defendant and Appellant. | A167431<br><br>(Marin County Super. Ct. No. JV27156A) |

In this juvenile dependency proceeding, defendant L.G. (Father) appeals from an order issued after the 12-month status review hearing (Welf. & Inst. Code, § 366.21, subd. (f)), which terminated family reunification services regarding his son, T.G. (the minor).[1]  Father contends the juvenile court erred because he did not receive reasonable services and because there was a substantial probability the minor would be returned to his care if services were provided.  We will affirm the order.

_____

        [1] Except where otherwise indicated, all statutory references are to the Welfare and Institutions Code.

# I. FACTS AND PROCEDURAL HISTORY

The minor was born in November 2010. At the time plaintiff and respondent Marin County Health and Human Services (Department) became involved in 2021, the minor lived with his mother, N.S. (Mother). The Department filed a section 300 petition that alleged severe neglect by Mother and a failure to protect by Father because he "failed to seek legal custody or take other actions to ensure [the minor's] basic needs were met."

## A. Initial Proceedings and Appeals

The parties submitted to jurisdiction in January 2022, based on an amended petition alleging that Father negligently failed to adequately protect the minor from Mother. The juvenile court placed the minor in a Short-Term Residential Therapeutic Placement (STRTP).

In its February 2022 disposition order, the juvenile court declined to place the minor in Father's care on the ground it would have been to the minor's detriment. (§ 361.2.) The court approved a case plan by which Father would show he had safe and sustainable housing for the minor, identify a support network of at least three people who could help him care for the minor, demonstrate that his home was free from drugs and alcohol, submit to drug testing, and participate in a substance abuse assessment. The plan also required Father to take parenting classes and participate in family therapy when deemed appropriate. (Individual therapy was added to the plan in September 2022.)

Father appealed from the disposition order, claiming there was no substantial evidence to support the conclusion that it would be detrimental to the minor if placed in Father's care (Case No. A164680). We affirmed the order.

At the six-month status review hearing (§ 366.21, subd. (e)), the juvenile court again ruled that it would be detrimental to place the minor in Father's care.  Father appealed (Case No. A166192).  While the appeal was pending, the court re-authorized the minor's placement in a STRTP.  Father appealed this order as well (Case No. A166524).

We consolidated those two appeals and affirmed.  We found that substantial evidence supported the ruling that placing the minor in Father's care would still be detrimental to the minor because "Father did not comply with aspects of his case plan," "did not make progress in eliminating the issues that led to the detriment finding at disposition," and "had not shown an ability to handle [the minor's] needs or addressed concerns about his [own] substance use."  We also affirmed the placement of the minor in the STRTP.

## B.  12-Month Status Review

### 1.  *Department Report*

In November 2022, the Department filed a report for the 12-month status review, recommending that reunification services be terminated.  According to the report, the minor enjoyed his placement at the STRTP, made progress on his behavioral goals, and was meeting with a school counselor and individual therapist.

The report summarized the services that the Department had offered to Father, including:  monthly meetings to discuss case planning and the minor's health, safety, and well-being; monthly communications with Father to monitor and discuss reunification services and review case plan activities; transportation assistance; assistance in using ACCESS (the mental health evaluation provider) and therapy referrals through Marin County Behavioral and Recovery Services; monthly Child and Family Team (CFT) meetings; referrals to substance testing and a substance use assessment; referrals to a

3

Positive Parenting Program and contact with the facilitator to verify attendance and participation; contact with the Marin County eligibility office regarding Father's Medi-Cal application; coordinating and offering Department-paid individual therapy for Father; offering to help Father build a support network; and coordinating and funding visitation for Father with professional supervision and parent coaching.

Father, however, had not cooperated with the Department. He refused to provide information that would allow the Department to assess his ability to provide for the minor if returned to his care. He refused to answer questions regarding housing, employment, and his support network. He consistently disputed the need for supportive services that had been put in place to help address the minor's significant needs in school and at home.

Nor had Father met the requirements of his case plan. As to safe and sustainable housing, he claimed he lived on a boat but resisted the efforts of the new child welfare social worker (Peasley) to confirm the details of his residency. He did not allow Peasley to visit the boat until November 8, 2022. He claimed the boat belonged to a friend who let him live there, but he did not put Peasley in contact with the friend by the end of the review period. The social worker was unable to confirm with the boat's owner or the harbormaster that Father was living on the boat or that the minor would be allowed to live there with him.

As for his support network, when asked to identify at least three people who could keep the minor safe and assist with meeting the minor's needs, Father said there were " 'doctors and lawyers' " but he did not want to involve them because they were busy and he did not want people knowing his business. Despite Father's refusal to provide information about his relatives, the social worker tracked down a paternal aunt who was willing to support

4

Father and the minor and attended two CFTs, but Father had no other support network. Furthermore, Father was upset that the minor had developed his own support network, including his CASA and his former resource parent, saying it was " 'disgusting' " that the minor spent time with them. He saw no need to ask the minor if he enjoyed the visits because he knew his son.

The case plan also required Father to participate in a substance abuse assessment and submit to substance tests. During the review period, Father continued to refuse an assessment and denied that he had issues with alcohol or substance abuse. He continued to dismiss the Department's concerns about his history of DUI's — including his five DUI convictions in a 10-year-period (the most recent in 2018) — insisting that " 'they have nothing to do with anything.' " He missed the first substance test after the six-month review hearing, tested from September 9, 2022, through October 12, 2022, and missed a test on October 20, 2022. He consistently tested positive for marijuana. Initially, he claimed to use marijuana for medical reasons but failed to provide proof of a prescription. Later, he said he did not need a prescription because recreational use of marijuana was legal.

Mental health services had been added to Father's case plan after it became apparent that he would benefit from therapeutic support. Peasley confirmed that Father still displayed behaviors indicating he could use that support. Father remained upset with the Department and the previous social worker. He was quick to anger, raised his voice, claimed that providers were lying and that the court's involvement was based on lies and hearsay, and believed that difficulties in coordinating therapy were the result of a conspiracy against him.

Individual therapy for Father was ordered on September 1, 2022. Later that month, Marin County Eligibility confirmed that Father was in the process of applying for Medi-Cal and spoke with Father on September 16, 2022, but Father never went to the office to fill out the required paperwork. He was given the documents to sign on September 20 and 27, 2022, but he did not turn them in until September 30, 2022. His Medi-Cal application was eventually approved.

Father participated in a mental health evaluation around October 10, 2022, but refused to sign a release for the Department to review the evaluation and discuss it with the evaluators. The Department learned that Father's mental health needs were deemed not high enough for a referral to services through the county, but without the release, the Department was unable to review the assessment to see if Father accurately reported his mental health.

After learning about the denial of county services, the Department offered to pay for Father's private therapy to expedite his access to mental health services rather than waiting for a release to learn why he was denied county services. The Department's mental health practitioner explained to Father the options for therapy on October 31, 2022, but he never followed up.

On November 10, 2022, Father told the social worker that he was willing to engage in therapy and sign the release for the Department to obtain information from the mental health evaluation provider. But when Father was given the release to sign, he said he wanted to review it further before signing. At the social worker's request, Father called the Department's mental health practitioner and met with the therapist (Dr. Russell) on November 25, 2022.

As for family therapy, the case plan provided that the minor and Father would engage in family therapy when deemed appropriate. During the review period, the minor's therapist (Mr. Jacobs) tried to incorporate Father into the minor's session to include therapeutic family work. He reached out to Father in late September 2022, but Father did not respond. Eventually, Father was incorporated into one of the minor's therapy sessions by phone, but Mr. Jacobs found Father to be " 'minimally inappropriate' " when he complained about the support provided to the family and the initial involvement of external agencies.

As for visitation and parenting, the Department still had concerns about Father's behavior in the minor's presence, which had led the juvenile court at the six-month review hearing to change Father's visits from minimally-supervised to fully-supervised. As a result of this change, visits were paused from September 1, 2022, to September 13, 2022, while the Department arranged for supervision, but supervised phone contact continued. On September 13, 2022, Father was offered supervised visits on Mondays and Wednesdays, but he declined the Wednesday visits without explanation. At the first fully supervised visit, the social worker noted that Father was frustrated, continuously lectured the minor, and needed to be redirected several times. The STRTP was later able to supervise only one visit a week; Father attended all of those visits, and they went well.

Father consistently opposed the return to supervised visits and claimed it was due to hearsay. The social worker advised Father that one way to work toward reduced supervision was to attend parenting classes and demonstrate new parenting skills as indicated in the case plan. But Father continued to oppose parenting classes because he believed they were " 'not normal,' " parenting was something " 'you are born with or not,' " and he had

7

been equipped to parent the minor since birth. In addition, Father had already attended three parenting sessions and believed he should not have to take more.

The Department contracted with a private parenting coach and visit supervisor, Dr. Wanamaker, to work with Father. Father initially balked at the idea because he thought he had done nothing wrong and was already a safe and competent parent. He did not begin meeting with Dr. Wanamaker until October 31, 2022, as part of his weekly supervised visit with the minor, and had three sessions. Dr. Wanamaker described a very loving relationship between the minor and Father, and Father was attentive, appropriate, and engaged during visits.

In recommending the termination of services, the Department asserted that Father had made only minimal progress on his case plan objectives, was extremely resistant to services and supports, pushed back on individual therapy, denied any need for concern about his substance abuse history, refused to undergo a substance abuse assessment, continued to test positive for marijuana, had nearly no support network and resented the minor having one, disputed the need for services that had helped the minor stabilize and progress, denied any responsibility for the past neglect of the minor, and displayed a very volatile temper with Department workers and other providers. The Department therefore believed that Father was unable to make the progress needed for the minor to be returned to his care even with an additional six months of services. His efforts to visit the minor appropriately did not remedy the concerns about his ability to parent, because Father had been visiting regularly with the minor before his removal too. The Department explained: "The concern was, and continues to be, that

[Father] is unable to identify and address issues that directly impact his son's wellbeing."

### 2. *Department Addendum Report*

At the 12-month review hearing in December 2022, the matter was set for a contested hearing on January 27, 2023. On January 20, 2023, the Department submitted an addendum report covering developments since its November 2022 report.

According to the report, Father provided the Department with an email from the owner of the boat where he was staying on December 7, 2022. The boatowner asserted that Father had lived on the boat for over a year, paid the slip fee, and maintained the boat. She also said Father could live there with the minor. The social worker confirmed this with the boatowner on December 12, 2022. On January 12, 2023, however, the harbormaster informed the social worker that "liveaboards" were not permitted and that Father specifically was not supposed to be aboard the boat more than three days a week. Father had told the harbormaster that he lived somewhere else the rest of the week.

Because Father had finally signed a release, the Department was able to obtain information from Marin County Behavioral Health and Recovery Services about the mental health assessment Father completed in October 2022. Father had " '*declined* any mental health concerns at the time of screening and state[d] that he is only seeking therapy to comply with [the] court order.' " (Italics added.)

Father had also signed a release for the Department to speak with his individual therapist, Ms. Russell. On December 16, 2022, the therapist confirmed that Father had attended weekly sessions since November 25, 2022. She noted that Father claimed he had nothing to do with what

9

happened to the minor when the minor lived with Mother, and Father had issues with the previous social worker, the CASA, and the former caregiver. The therapist believed a psychological evaluation might be warranted. At a session with Father that day, however, Father became upset when she broached the topics of a substance abuse evaluation and possible psychological evaluation, claiming he was going to hire a civil rights attorney.

On December 9, 2022, Father again refused to undergo a substance abuse evaluation or include his friends in his support network. In the nine times he was called for drug testing since the Department's last report, he had two "NO SHOWS" and one test was rejected due to damage to the collection device. Of the six tests that were analyzed, all were positive for marijuana and one was positive for alcohol. When confronted with the one positive alcohol result, Father denied drinking alcohol, and a toxicologist could not confirm that the result was due to alcohol consumption rather than incidental exposure. As for the two missed tests, Father offered no explanation. He provided one additional test on January 13, 2023, which was positive for marijuana.

Since the last report, Father continued visiting the minor, and there were no safety concerns. He also continued weekly parenting sessions with the parenting coach, Dr. Wanamaker, to whom he expressed his frustration with the Department. After the Department recommended termination of reunification services, Father talked about " 'moving on' " if he could not " 'have his son.' " Dr. Wanamaker invited Father to think about how the minor might feel and react if Father walked away from him. In the following session on January 2, 2023, Father continued to talk about his son being taken from him " 'for no reason' " and reiterated that he would " 'just move on' " if the minor was not going to live with him.

The Department continued to recommend that reunification services be terminated for both parents.

### 3. *12-Month Contested Hearing*

Peasley was the only witness at the contested hearing on January 27, 2023. He testified that the case plan required family therapy to be explored when deemed appropriate by the minor's therapist, and before the current review period, neither the Department nor the minor's clinician thought it was appropriate to begin. Peasley added that the minor's previous therapist had concerns about Father's presentation and his ability to control what he said and be appropriate in a family session. The previous therapist believed that Father needed individual work. Individual therapy was therefore added to Father's case plan at the six-month review and was discussed as a "prerequisite" to family therapy. As Peasley summarized, Father was not assessed to have a high enough need to be served by Marin County, so the Department offered to pay for a private therapist to facilitate therapy occurring sooner than if he had enrolled in another program. Private therapy was further delayed by Father's inaction, his insistence that therapy was unnecessary, and the difficulty Peasley had in contacting him.[2]

As for parenting classes, Peasley referred Father to Marin County Positive Parenting, a weekly virtual class. But Father refused to participate in the class for a number of reasons until he started to work with Dr. Wanamaker.

Peasley replaced the previous social worker assigned to the case in August of 2022. It was uncommon for a social worker to be replaced, but the

---

[2] On cross-examination, Father's counsel asked if Peasley would agree it takes time to get Medi-Cal approved, and Peasley responded: "[The process] goes quicker [when] someone is responsive to requests for forms and documents and follows through on the dates and times they say they will."

11

relationship between Father and the previous social worker had become so tense that the Department believed that changing the social worker might help move things forward. Father continued to blame the previous worker for most of the Department's involvement and spoke of her in very derogatory terms. He also became upset with Peasley when he asked about engaging in services. Father was very quick to become angry, yell, and curse, which can be signs of substance use or intoxication. Although those behaviors could also be explained by a mental health condition, this possibility could not be explored due to Father's lack of cooperation with providers.

After Peasley's testimony, counsel for Father and counsel for Mother argued that reasonable services were not provided, services should be extended to the 18-month date, and there was a substantial probability the minor could be returned to parental custody with additional services. The minor's counsel argued that family therapy was a critical component of the case plan and, because it did not occur, the services provided to Father were not reasonable.

### 4. *Juvenile Court's Order*

The juvenile court ruled orally on February 7, 2023, that the minor could not be returned to either parent, services were reasonable, and services could not be extended to the 18-month date based on a substantial probability of return. As to whether services were unreasonable due to the absence of family therapy, the court stated: "This court can't find that family therapy was critical when . . . [F]ather resisted signing up for therapy, even though he had one-on-one help in doing so, was evasive in his agreement to engage, and, essentially, delayed the process unnecessarily."

The juvenile court commended Father for visiting the minor but stated: "[A]t this point, [F]ather has not demonstrated the skills that can keep [the

minor] safe and protected, physically and emotionally. He has been secretive, aggressive, noncooperative and has not addressed concerns about substance abuse." The court therefore terminated reunification services and adopted the Department's proposed findings. Father filed a timely appeal.[3]

## II. DISCUSSION

At the 12-month review, the juvenile court shall return a child to the parent unless it finds that doing so would create a substantial risk of detriment to the child's safety, protection, or physical or emotional well-being. (§ 366.21, subd. (f).) If (as here) the child is not returned, the court has a few options. One option is to continue the case with additional services, but only if the court finds "[1] that there is a substantial probability that the child will be returned to the physical custody of their parent or legal guardian and safely maintained in the home within the extended period of time or [2] that reasonable services have not been provided to the parent or guardian." *Id.*, subd. (g)(1).)

Father contends the juvenile court erred by denying his request to continue reunification services because reasonable services were not provided and there was a substantial probability that the minor could be returned to his custody with additional services. We disagree.

### A. Reasonable Services

The Department is not required to provide perfect reunification services. (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 972 (*Alvin R.*).) It need

---

[3] Mother appealed as well. In her opening brief, she joined in Father's arguments "for the purpose of acquiring a reversal of the order terminating reunification services and finding reasonable services had been provided to [F]ather." (Cal. Rules of Court, rule 8.200(a)(5).) She has not asserted error as to any findings pertaining to the reasonableness of services she received or the likelihood of the minor's return to her care.

only make a reasonable effort to provide services that identify the problems leading to loss of custody and to help remedy those problems. (*In re Riva M.* (1991) 235 Cal.App.3d 403, 414.) We review the juvenile court's ruling for substantial evidence. (*In re Misako R.* (1991) 2 Cal.App.4th 538, 545.)[4]

Here, the problems leading to removal — and the reasons for not placing the minor with Father initially — centered around inadequate housing, lack of a support network, and issues regarding substance abuse. To address these problems, the Department created a court-approved case plan requiring Father to have safe and appropriate housing for the minor, maintain a support network that could help him care for the minor, and show that his home was free from substance abuse by submitting to drug testing and undergoing a substance abuse assessment. The case plan also required Father to take parenting classes, engage in individual counseling, and participate in family therapy when deemed appropriate.

To help Father remedy the problems leading to removal and comply with his case plan, the Department asked Father about his housing and whether the minor could live there (efforts Father largely rebuffed), offered to help him build a support network, reached out to a paternal aunt despite Father's refusal to provide information about his relatives, referred Father for a substance abuse assessment, referred Father for substance testing, referred Father to a parenting program and contacted the facilitator to verify his participation, provided Father with a parenting coach, provided Father with access to the mental health evaluation provider, made therapy referrals, contacted the Marin County eligibility office regarding Father's Medi-Cal

---

[4] Father contends we should disregard the Department's arguments because its factual assertions are not supported by citation to the record. The record citations for the facts on which we rely are contained in the Department's statement of facts.

14

application, and offered Department-paid individual therapy when county services were unavailable.  The Department also held monthly CFT meetings, provided transportation assistance, coordinated and funded professional supervision for visits, and communicated with Father to monitor and discuss reunification services and review case plan activities, notwithstanding difficulties in reaching Father and Father's volatile behavior.  Substantial evidence supports the conclusion that the Department provided reasonable services.

Father's arguments to the contrary are unavailing.  He contends the Department delayed his access to individual therapy and a parenting coach, noting that individual therapy was not ordered until September 1, 2022, and did not begin until November 25, 2023.  But there is substantial evidence that Father contributed to the delays by not timely submitting paperwork for Medi-Cal and for therapy, claiming to the mental health evaluator that he had no mental health issues (which precluded county services), delaying signing a release for the Department to discuss with the evaluator why county services were denied, and initially resisting a parenting coach.  It is not our role to reweigh the evidence.

Father's reliance on *Alvin R.*, *supra,* 108 Cal.App.4th 962 is misplaced.  In *Alvin R.*, the Department was entirely responsible for a delay in arranging therapy for the minor as a precursor to joint counseling and failed to obey a court order to arrange for family therapy.  Here, by contrast, the Department arranged for the minor's therapy, and Father substantially contributed to the delay in obtaining individual therapy and a parenting coach.

Father also argues that reasonable services were not provided because the Department did not provide family therapy.  However, the case plan specified that family therapy would occur only when deemed appropriate, and

15

there was no evidence the minor's therapist had reached this conclusion. The minor's therapist allowed Father to participate in one phone session with the minor but noted that Father's conduct was minimally inappropriate.

Father next complains that there was a delay in providing unsupervised visitation. He relies primarily on *Tracy J. v. Superior Court* (2012) 202 Cal.App.4th 1415, 1427 (*Tracy J.*), which stated: "When the Agency limits visitation in the absence of evidence showing the parents' behavior has jeopardized or will jeopardize the child's safety, it unreasonably forecloses family reunification on the basis of the parents' labeled diagnoses and does not constitute reasonable services." In *Tracy J.*, the agency had restricted visitation for the parents, notwithstanding their demonstrated ability to care for the child, merely because they had developmental disabilities. Here, by contrast, Father's visitation remained supervised because Father had not addressed the safety concerns that had led the juvenile court to increase supervision for visits at the six-month hearing. Among other things, concerns remained over how Father spoke to the minor about the first social worker and resource parent.

Lastly, Father argues that the Department did not provide housing assistance. There is ample evidence, however, that Father did not seek housing assistance, represented that his current housing was adequate, and refused to provide details in response to the Department's efforts to better understand his living situation. It turned out that, contrary to his representations, Father was not permitted to live on the boat full time with the minor, but the Department did not discover this until shortly before the end of the review period, due at least in part to Father's misinformation.

In sum, while Father points to evidence that he believes supports his position, he does not show that there was a lack of substantial evidence

supporting the juvenile court's finding of reasonable services.

## B. Substantial Probability of Return

Father contends that services should have been extended because "there [was] a substantial probability that the child [would] be returned to the physical custody of the parent or legal guardian and safely maintained in the home within the extended period of time . . . ." (§ 366.21, subd (g).) We disagree.

To find a "substantial probability" of return, the juvenile court must find three elements: "(A) That the parent or legal guardian has consistently and regularly contacted and visited with the child. [¶] (B) That the parent or legal guardian has made significant progress in resolving problems that led to the child's removal from the home. [¶] [And] (C) [that] [t]he parent or legal guardian has demonstrated the capacity and ability both to complete the objectives of their treatment plan and to provide for the child's safety, protection, physical and emotional well-being, and special needs." (§ 366.21, subd. (g).)

There is no dispute that Father satisfactorily visited the minor. The question, therefore, is whether substantial evidence supports the juvenile court's conclusion that the other two elements were not established. It does.

### 1. *Progress in Resolving Problems Leading to Removal*

Substantial evidence supports the conclusion that Father made little or no progress in resolving the problems that led to removal. He never obtained adequate housing, since the harbormaster stated he was not permitted to stay all week on the boat, let alone with the minor. While he claims his housing is still sufficient because he has stayed on the boat for a while without the rules being enforced against him, the fact is that he has no authorized housing and risks eviction. Father also did not disclose any

17

information regarding a support network. More notably, he never completed a substance abuse assessment. The results of his drug tests were consistently positive for marijuana and at least one test detected alcohol. Although the marijuana levels were not high and Father denied consuming alcohol, it was reasonable to conclude that he had made little progress given his unexplained missed tests, his history of DUIs, his refusal to see why the Department would be concerned about those DUIs, and his continuing refusal to complete a substance abuse assessment. Father did begin individual counseling and parenting classes during the most recent review period, but it did not appear to result in significant behavioral change.

Father argues that the *minor's* mental health has substantially improved since the start of the case. But this is the minor's progress, not Father's, and it supports the conclusion that the minor should stay at the STRTP (or other appropriate facility) rather than be returned to Father. At the STRTP, the minor receives services and treatment needed to address his mental health struggles. Father does not point to evidence that his actions helped the minor improve. He never even acknowledged that the minor has significant mental health issues, claiming instead that the minor's only problem was being separated from Father.

### 2. *Capacity and Ability to Complete the Plan*

Given Father's lack of progress over the past 12 months, and his continuing resistance to the Department's offers of services and refusal to acknowledge that the minor has significant mental health issues, it was reasonable to conclude that Father had not demonstrated the capacity and ability to complete the objectives of the case plan and provide for the minor's safety, protection, physical and emotional well-being, and needs. To put it another way, there was substantial evidence that, even with additional

services, there would remain a substantial risk of detriment to the minor if returned to Father's physical custody at the 18-month review.

The juvenile court's findings and order were supported by substantial evidence.

### III.  DISPOSITION

The order is affirmed.

_____

CHOU, J.

We concur.

_____

SIMONS, Acting P. J.

_____

BURNS, J.